UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

IAN MANNING,

                Plaintiff,

v.                                               2:11CV476

MICHAEL J. ASTRUE, COMMISSIONER,
Social Security Administration,

                Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Ian Manning ("Manning" or "plaintiff"), an Iraq war veteran and former Marine, brought this action under 42 U.S.C. §§ 1383(c)(3) and 405(g) seeking judicial review of the Commissioner of the Social Security Administration ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. Manning claims he is disabled due to Post-Traumatic Stress Disorder ("PTSD") resulting from his service. By order filed November 23, 2011, this action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. After review of the complete record, the undersigned finds that substantial evidence supports the ALJ's finding that Manning's PTSD does not preclude all work, given his successful treatment for substance abuse. Accordingly, for the reasons stated in detail below, the Court recommends that the final decision of the Commissioner be AFFIRMED.

1

# I. PROCEDURAL BACKGROUND

On March 4, 2010, Manning filed an application for DIB alleging disability beginning May 12, 2009. (R. 122-23).[1] The Commissioner denied his application initially, and upon reconsideration. (R. 55-78). Manning requested an administrative hearing which was conducted on March 29, 2011. (R. 27-48).

On April 20, 2011, Administrative Law Judge ("ALJ") O. Price Dodson found that plaintiff was not disabled within the meaning of the Social Security Act, and denied his claim for DIB. (R. 12-22). On June 24, 2011, the Appeals Council denied review of the ALJ's decision thereby making the ALJ's decision the final decision of the Commissioner. (R. 1-5).

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), on August 24, 2011 Manning filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

# II. FACTUAL BACKGROUND

Manning was born on January 31, 1981, and was twenty-eight years old at the time of the alleged onset of disability. (R. 33, 122). He lives with his wife and children, ages eight and three. (R. 33). Manning holds a GED and has obtained twenty-seven credit hours towards an associate's degree in culinary arts. (R. 33). He has a driver's license and drives to Portsmouth Naval Hospital every day. Manning was a chef prior to joining the Marine Corps in April 2006. (R. 35). As a Marine, he was assigned to an anti-IED team as a machine gunner, which required him to man the top of a Humvee as it traveled. (R. 40). Manning was deployed to Iraq from October 10, 2007 to May 5th, 2008, where he engaged in extensive combat and sustained the

---

[1] Page citations are to the administrative record.

majority of his impairments.  (R. 40).  He was exposed to multiple IED blasts.  His duties required him to perform tasks without equal in the civilian world, including searching the bodies of deceased insurgents. (R. 583).

In January of 2009, as a result of his service connected injuries, Manning joined the Wounded Warrior battalion which requires him to appear regularly for medical appointments, but no other service-related duties. (R. 34, 36).  At the time of the hearing, Manning testified that he typically gets up in the morning around 7:30, drives to Portsmouth Naval Hospital where he remains until 3:00. (R. 36).  After 3:00, he drives home, spends time with his family, and is usually in bed by 9:00. (R. 36).  He has medication that is supposed to help him sleep, but it is not very effective. (R. 39).  While at home, Manning is able to assist with household chores such as doing dishes, sweeping, vacuuming, and shopping with his wife. (R. 37).  On Friday evenings he has a date night with his wife. (R. 38).  At the time of the hearing, Manning was scheduled to be medically discharged from the Marine Corps around June 2011. (R. 44).

Manning testified that he has a shoulder injury, hepatitis C, Post Traumatic Stress Disorder ("PTSD"), traumatic brain injury, and drug and alcohol addiction.  (R. 43-44).[2]  With respect to his brain injury, Manning described neuro-psych testing which he believes shows that the frontal lobe of his brain was damaged to the point where he doesn't remember auditory instructions, and his short-term memory is severely damaged. (R. 44).  He stated that his hearing was also affected. (R. 44).

---

[2] Though Manning references his shoulder injury and hepatitis C, he does not contest the ALJ's finding with respect to the limits imposed by his physical impairments.  Therefore, the undersigned's analysis will be limited to Manning's PTSD, traumatic brain injury, and substance abuse.

Manning's medical records show extensive treatment for his PTSD and substance abuse, primarily alcohol. He has inpatient and outpatient treatment records beginning in April 2009. (R. 523). Notes from his April 24, 2009 visit to Portsmouth Naval Hospital indicate that Manning sought treatment for hepatitis C and alcohol abuse. (R. 522). He was then seen by Dr. Maria A. Caggiano at the psychiatry clinic for his alcoholism and difficulty sleeping. (R. 519). He was prescribed sleeping medication and was instructed to attend Alcoholics Anonymous meetings prior to beginning hepatitis C treatment. (R. 519). Manning's May 12, 2009 treatment notes indicate that he was responding well to the sleep medication, and had attended AA meetings. (R. 513-15). He was advised to continue with this treatment and was not placed on any new medication. Id. In October 2009 Manning began Substance Abuse Rehab Program, ("SARP") an intensive outpatient treatment program for his alcohol abuse. (R. 435-37, 461). However, he was discharged after five days because he had been exposed to the H1N1 flu from his children. (R. 427-29). Notes from an October 21, 2009 visit indicate that Manning was psychologically fit for full duty. (R. 450).

Manning was seen again on November 6, 2009 for alcoholism, anxiety, depression, and insomnia related to a mental disorder. (R. 416- 19). He was diagnosed with alcohol dependence, anxiety disorder (differential with PTSD), hepatitis C, and exposure to war/reintegration stress. (R. 419). Manning was given a Global Assessment of Functioning ("GAF") of 55.[3] (R. 419). He also indicated that he would attend the SARP program as soon as he was medically cleared of H1N1. (R. 418). He was declared psychologically fit for full duty.

---

[3] The GAF scale is a numeric scale (0 through 100) used for reporting the clinician's judgment of an individual's overall level of functioning at a specific point in time. It is rated with respect only to psychological, social, and occupational functioning. A GAF score in the 51-60 range indicates moderate to serious symptoms in social and emotional functioning. Diagnostic and Statistical Manual of Mental Disorders Text Revision pp. 32-4 (4th ed. 2000).

(R. 419). Manning was seen by a psychologist on November 19, 2009 who concluded that Manning's cognitive and neurological screenings were normal, but that other findings suggested "intense situational stress leading to dysphoria, anxiety, and possible exacerbation of combat related distress." (R. 407). He was advised to continue mental health and SARP treatment. (R. 407).

Between November 23, 2009 and December 4, 2009 Manning received inpatient psychiatric treatment after posting a message about killing his wife on Craigslist. (R. 398-402). Manning's records reflect a GAF score of 50 on admission and 65 upon discharge after the ten-day stay. (R. 222).[4] He was diagnosed with alcohol dependence with physiologic dependence, substance-induced mood disorder, and adult anti-social behavior. (R. 222). The discharge narrative indicated that Manning had stopped consuming alcohol, and recommended that he continue counseling and seek further SARP or inpatient alcohol treatment.[5] (R. 222).

Manning was then admitted to a substance abuse treatment center from December 4, 2009 to January 1, 2010. (R. 227-242). He indicated on admission that he had not consumed alcohol since November 5, 2009. Manning's discharge diagnoses were alcohol dependence, depression, PTSD, nicotine dependence, hepatitis C, and insomnia. (230-31). His GAF score was assessed at 41. (R. 231). Following his discharge, Manning began psychotherapy treatment with Dr. Clarence Farmer who followed Manning's care through the date of the hearing. (R. 282-83, 293-94, 300-01, 305-06, 316-17, 320-21, 331-32, 335-38, 340-41, 345-46, 355-61). During his initial

---

[4] Manning's admission note from this treatment reflects a GAF score of 20, however the narrative summary of his inpatient treatment which was completed by a different provider, states that his admission GAF score was 50. (R. 222, 226, 401). The parties have not accounted for the discrepancy, and have both used the GAF 50 in their statement of facts.

[5] Manning's narrative summary indicated that he had stopped consuming alcohol in October 2008. (R. 220). However, other records show that last consumed alcohol on November 5, 2009. (R. 230).

visit on January 5, 2010, Dr. Farmer reported that Manning "presented with full range of affect. His mood appeared euthymic but he complained of significant depression and anxiety with periodic panic attacks." (R. 358). In terms of cognitive ability, Dr. Farmer reported that Manning "complained of poor concentration but denied a significant memory disturbance." (R. 358). Manning described his symptoms as "rumination/nightmares over past combat experiences, isolation from family, dysphoria, anxiety, irritability" and insomnia/sleepwalking. (R. 358). Dr. Farmer concluded that Manning had a GAF score of 55 and was functioning within the average range of intellectual ability. (R. 358). He diagnosed Manning with PTSD, major depressive disorder recurrent, and alcohol dependence. (R. 358).

Manning saw Dr. Farmer again on January 12, 2010. (R. 345-47). He reported that Manning exhibited good insight, that his affect was full range, but he was depressed and complained of racing and tangential thoughts, and that his PTSD symptoms continued with intensity. (R. 346). Manning's next visit with Dr. Farmer was on January 14, 2010. (R. 341). Notes reflect that Manning complained of a recent increase in anxiety with obsessive rumination regarding his health. (R. 341). He expressed feeling out of control and increasing apprehension and anxiety. (R. 341). During Manning's January 21, 2010 visit, Dr. Farmer reported that Manning was "doing reasonable well," and that his emotional status was improving. (R. 338). On January 26, 2010 Dr. Farmer's notes indicate that Manning described recent anger issues and crying spells which he was able to control, though he was confused as to the cause of his symptoms. (R. 336). Overall, Dr. Farmer opined that Manning was making some progress and demonstrated good insight. (R. 336).

6

Manning saw Dr. Farmer again on February 2, 2010. (R. 332). He reported that Manning's mood was improved. (R. 332). On February 9, 2010, Dr. Farmer noted that Manning was agitated, depressed, and described obsessive thoughts. (R. 321). On March 4, Dr. Farmer reported that Manning was stable, but felt that he needed further treatment for his PTSD. (R. 396). Notes from March 11, 2010 indicate that Manning continued to be depressed, agitated, and to have difficulty sleeping. (R. 391). On March 16, 2010, Dr. Farmer noted that Manning continued to complain of irritability and rumination regarding violent themes. (R. 294). Manning also described persistent insomnia and emotional issues. (R. 294). Notes from each appointment with Dr. Farmer up until March 16, 2010 indicate that Manning was released from care without limitations. The notes from March 16, 2010, however, reflect that Manning was released with work/duty limitations due to "poor emotional status." (R. 294). On March 25, 2010, Dr. Farmer's notes indicate that Manning's mood was improved and that he was doing "reasonably well." (R. 283). Manning was still struggling with insomnia and was in the process of being referred to an inpatient PTSD/substance abuse treatment program. (R. 283). Dr. Farmer indicated that Manning was released without limitation. (R. 283).

Manning was also under the care of Dr. Thaddeus Ozimek for treatment of his PTSD. On March 17, 2010, Dr. Ozimek reported that Manning was "alert and oriented" and that he showed no agitation, "thought processes were linear and goal-directed.... insight and judgment seemed fair." (R. 299). He also noted that Manning "has been alcohol free since November 2009." (R. 299). Manning was released without limitations. (R. 299). On March 26, 2010, Manning again reported being alcohol free, and Dr. Ozimek described Manning as alert, oriented, speech slow, good eye contact, mood better but still mediocre, and affect slightly dysphoric. (R. 280). He was

7

released with work/duty limitations. (R. 280). Notes from Dr. Ozimek on April 14, 2010 reflect that he found Manning alert, oriented, mood down, affect slightly dysphoric, and with thought processes linear and goal-directed with good insight and judgment. (R. 273). He was released with work/duty limitations. (R. 273).

On June 10, 2010, Dr. Ozimek found Manning alert, oriented, mood "up and down," affect euthymic, and thought processes linear and goal-directed. (R. 544). He indicated that Manning's cognitive exam seemed "grossly intact" and his insight and judgment seemed fair. (R. 544). Manning reported being alcohol free for seven months, and was scheduled to attend inpatient PTSD treatment. (R. 544). He was released without limitation. (R. 544). Dr. Ozimek's June 29, 2010 notes reflect similar findings. (R. 546). On July 1, 2010, Dr. Ozimek described Manning's psychiatric exam as "normal." (R. 548). Notes from July 13, 2010 indicate that Manning reported feeling more calm and in a better mood on his current medication regime, though he continued to have difficulty sleeping and was prescribed a change in medication. (R. 550).

Because of Manning's exposure to IED blasts during combat in Iraq, Manning was examined by neuropsychologist, Karen Johnson, Ph.D., from March 30, 2010 to June 29, 2010. (R. 569-80). Dr. Johnson reported that Manning was alert, friendly, and cooperative. (R. 571). He made and maintained good eye contact, and his verbalizations were relevant, fluent, and goal-directed. (R. 571). Dr. Johnson's notes reflect that "during the initial interview CPL Manning presented with depressed mood and restricted affect. However, during the clinical interview held several days later, his mood and affect appeared to be within normal limits." (R. 571). Dr.

Johnson also reported that "Manning's abstract reasoning abilities appeared to be within normal limits...however his insight and judgment appeared to be limited." (R. 571).

Manning reiterated in during his consultation that he has abstained from drinking alcohol since November 2009. (R. 572). Manning also indicated that he "continues to experience intrusive images and upsetting memories of incidents that occurred during his tour in Iraq," as well as difficulty falling asleep. (R. 572). He reported having "feelings of excessive guilt and worthlessness...and recurrent thoughts/themes of death (without specific plan or intent)." (R. 572). In assessing Manning's emotional functioning, Dr. Johnson opined that "Manning appears to be experiencing a moderate to severe level of emotional distress involving low energy/drive, dysphoria, and agitation.... He often becomes impatient, resentful, and angry. He has had difficulty controlling or expressing his anger appropriately...." (R. 573). On the Zung Self-Rating Depression Scale, Manning fell within the severe to extreme range. (R. 574). On the Beck Anxiety Inventory, he scored within the severe range of anxiety. The Trauma Symptom Inventory reflected that Manning had difficulty handling anger and understanding his own behavior. (R. 574).

Manning obtained the highest possible score on the memory test, and generally scored within the average to high on his academic/intellectual tests. (R. 574). He scored within the average to superior ranges on his attention/concentration tests, and within normal limits on his motor skills test. (R. 575). Manning scored above average on his language and naming skills generally scored within the high average rage for verbal abilities. (R. 576). Manning's scores on the perceptual reasoning/visual-spatial/constructional ability tests were within the average range. (R. 576). His cognitive processing speed tests fell within the very superior, superior, and average

9

ranges, and his memory and learning scores were all in the high average to average ranges, as were his executive functions. (R. 576). In her final assessment, Dr. Johnson diagnosed Manning with PTSD (chronic, moderate), depressive disorder, congitive disorder (mild), and a GAF score of 40-49.

Manning began inpatient treatment for his PTSD on August 4, 2010. (R. 564-68). Notes from his initial examination show that Manning's mood was "sober," his affect was congruent but tearful, his thought process was linear, logical, and goal directed, judgment intact, insight fair, and psychomotor activity was normal. (R. 566). Manning's admission GAF score was 25. (R. 564). He was treated on an inpatient basis at Poplar Springs Hospital for twenty-seven days. (R. 554). His treatment included group psychotherapy and activity therapy, an AA program, and medication adjustments. (R. 566). Manning's discharge notes reflect that, after treatment, his mood was good, affect congruent, thought process linear, and judgment and insight were intact. (R. 554-55). His discharge diagnoses were PTSD, opiate dependency on agonist therapy with buprenorphine,[6] and alcohol dependence in remission. (R. 555). His GAF score was assessed at 50 to 60. (R. 555).

On September 30, 2010, following his inpatient treatment, Manning met with his psychologist, Dr. Farmer. (R. 556-57). Dr. Farmer opined, "When I last saw patient he continued to suffer from depressive symptomatology and marital issues; both have resolved. He

---

[6] "On agonist therapy" describes an individual who is on a prescribed replacement medication intended to diminish, and eventually eliminate the patient's original drug dependence. Diagnostic and Statistical Manual of Mental Disorders Text Revision pp. 32-4 (4th ed. 2000).

has been abstaining from alcohol. He continues with PTSD symptoms and believes that he will need continued treatment following medical discharge. Patient's emotional status has, however, improved." (R. 557). Manning was released without limitation. (R. 557). Manning also saw Dr. Ozimek on October 28, 2010. (R. 583-87). Dr. Ozimek noted that Manning was alert and oriented times four. He was neatly dressed and on time. Manning demonstrated some hypervigilance, his mood was anxious and irritable, and his affect was anxious but constricted. Dr. Ozimek determined that Manning's thought process was linear and goal directed, and his insight and judgment seemed fair. (R. 585).

Dr. Ozimek reported that Manning's final diagnoses included: PTSD; depressive disorder; cognitive disorder (mild); alcohol dependence (in early full remission); opioid dependence with physiological dependence on agonist therapy; traumatic brain injury with post concussive syndrome. (R. 585-86). He also opined that Manning's degree of industrial and military impairment was moderate to severe, but that his civilian impairment was moderate. (R. 586). He explained that Manning continued to experience significant psychiatric and neurological symptoms that would preclude him from further military service. (R. 586) Dr. Ozimek stated in his report that "despite [Manning's] extensive treatment, to include inpatient and outpatient treatment, he continues to experience problems with cognitive abilities such as concentration, which interfere with work, relationships, and leisure." Dr. Ozimek also indicated that Manning continued to have problems sleeping and with irritability. (R. 586). Dr. Ozimek's recommendation was that Manning continue with psychiatric treatment, and that he be discharged to his own custody as he was not a danger to himself or others, and was also capable of handling his own financial affairs. (R. 587).

Manning saw Dr. Ozimek again on November 3, 2010. (R. 596-97). He reported significant improvement, and though still restless, he was sleeping better. (R. 596). Dr. Ozimek determined that Manning's mood was "pretty good," his affect was euthymic, and insight and judgment was good. (R. 597). Dr. Ozimek released Manning with work/duty limitations. (R. 597). On December 1, 2010, Manning reported that he was sleeping well on his current medication regimen, and that his main complaint was daytime anxiety or panic episodes for which he was taking Xanax. Dr. Ozimek warned Manning on becoming too dependent on Xanax. (R. 601). Manning denied alcohol use, and his mood was described as "pretty good," with good insight and judgment. (R. 601). Dr. Ozimek saw Manning again on December 16, 2010 and reported that Manning was still using Xanax twice a day. His mood was calm, insight and judgment were fair, and he denied alcohol use. (R. 604). Manning was released with work/duty limitations. (R. 605). On February 3, 2011, Manning called Dr. Ozimek for prescription refills. (R. 609). He needed to cancel his appointment to care for his children because his wife was ill. (R. 609).

During Manning's hearing, the ALJ asked questions of a Vocational Expert ("VE"). Specifically, the ALJ asked whether there are any jobs available for a thirty year old individual with a high school education who is capable of light exertion, who is limited to simple repetitive tasks that do not involve close interaction with the public, and who would avoid overhead reaching with only occasional lifting and carrying. (R. 46-47). The VE responded that such jobs existed in significant numbers in the national economy. (R. 47).

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hayes, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

> The Social Security Regulations define "disability" as the:
>
> > inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A).  To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.[7]  20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability.   The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1.      Is the individual involved in substantial gainful activity?

---

[7] The Administration may satisfy its burden by showing that considering the claimant's residual functional capacity, age, education and work experience, the claimant is either disabled or not disabled based on medical-vocational guidelines, or "grids," published at 20 C.F.R., Pt. 404, Subpt. P, App. 2. However, technical application of the grids is not always appropriate, and thus the Commissioner must rely on the testimony of a VE to determine whether an individual claimant is in fact capable of performing substantial gainful activity available in significant numbers in the economy.  20 C.F.R. §§ 416.920(f) and 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 466 (1983); SSR 83-10, 1983 WL 31251 (S.S.A.).

2.      Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3.      Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4.      Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.      Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability.   An affirmative answer to question three or five establishes disability.  This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920.  The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008).  At all steps the ALJ bears the ultimate responsibility for weighing the evidence.  Hays, 907 F.2d at 1456.

Additionally, because Manning's case involves substance abuse which contributed to his impairments, the ALJ must conduct a further analysis to determine whether the claimant would still be disabled if he stopped using alcohol or drugs.  42 U.S.C. §423(d)(2)(C) ("An individual shall not be considered to be disabled…if alcoholism or drug addiction would…be a contributing

15

factor material to the Commissioner's determination that the individual is disabled."). The Social Security Administration rules explain that "if we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a); see McGhee v. Barnhart, 366 F.Supp.2d 379, 389 (W.D. Va. 2005) (citing Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir.2001); Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir.2001)).  Thus, the ALJ must first conduct the five-step inquiry accounting for all of the medical evidence.  If the ALJ determines that the claimant is not disabled, then the claimant is not entitled to benefits.  If, however, the ALJ determines that the claimant is disabled, and there is medical evidence of substance abuse, the ALJ must then determine whether the claimant would still be disabled if he or she discontinued substance use. Id.

### A.    ALJ's Decision

The ALJ made the following findings under the five-part analysis: (1) Manning has not engaged in substantial gainful activity since May 12, 2009 (the alleged onset date of disability);[8] (2) he has severe impairments of PTSD, depressive disorder, cognitive disorder, alcohol/opiate dependence, and recurrent shoulder dislocations; (3) his impairments (or combination of impairments) when he discontinued substance use do not meet or medically equal one of the listed impairments in Appendix 1; (4) when he discontinued substance use, Manning is unable to perform his past relevant work, but has the RFC to perform nearly a full range of light work that requires the capacity to lift and carry no more than 20 pounds occasionally, stand, sit, and walk

---

[8] The ALJ noted that Manning continues to earn income from active military service based on his enrollment in the Wounded Warrior program, but that this income does not represent remuneration for services performed after the alleged onset date. (R. 14).

six hours in an eight-hour day, and push/pull at weights no greater than lifting, with the limitation that he avoid close interaction with the public; and (5) there are jobs that exist in significant numbers in the national economy that Manning can perform. (R. 12-22).

In his motion for summary judgment, Manning argues that the ALJ's opinion is not supported by substantial evidence. He contends that the ALJ's finding that his PTSD is not work-disabling is contrary to the medical evidence of record. He also claims that the ALJ did not properly question the VE. The Court will address each of these arguments in turn.

**B.** **Substantial evidence supports the ALJ's opinion that without substance abuse, Manning no longer has an impairment or combination of impairments which would preclude all work.**

Manning argues that the ALJ's decision is not supported by substantial evidence because the ALJ "did not cite one single medical source for his key conclusions that [Manning's] condition no longer met a listing in the absence of alcohol abuse." (Pl.'s Mot. Sum. J., ECF No. 10 at 20). Manning asserts that the ALJ proceeded with his own medical evaluation rather than relying on expert evidence in the record.

At step two of the sequential analysis, the ALJ must determine whether the plaintiff has a severe, medically determinable physical or mental impairment. 20 C.F.R. §§ 1520(a)(4)(ii) and 416.921. The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c) and 416.920(c). In contrast, an impairment is not severe when it is only a slight abnormality that would have no more than a minimal effect on an individual's ability to work, regardless of the individual's age, education or work experience. Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984); see 20 C.F.R. §§ 404.1521(a) and

416.921. "At the second step of sequential evaluation, then, <u>medical evidence alone</u> is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." SSR 85-28, 1985 WL 56856, at *4 (S.S.A.). (emphasis supplied). Impairments must be established by "medically acceptable chemical and laboratory diagnostic techniques," and must have lasted or be expected to last twelve months. 20 C.F.R. §§ 404.1508 and 1509.

Because Manning has received a written diagnosis of mental illness, his mental impairments, considered singularly and in combination, must be assessed according to the "paragraph B" criteria. The limitations identified by these criteria are not used to determine RFC, but rather to rate the severity of plaintiff's mental impairments. 20 C.F.R. § 404, Subpart P, Appendix 1. To satisfy the "paragraph B" criteria, the mental impairment in question must result in at least two of the following: (1) marked restriction[9] of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended period[10]. 20 C.F.R. § 404, Subpart P, Appendix 1.

If a claimant does not satisfy the "paragraph B" criteria, he may nevertheless have a severe impairment if he satisfies the "paragraph C" criteria of 12.04 or 12.06, which requires that the claimant have a "complete inability to function independently outside the area of one's home" under 12.06 or "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities,

---

[9] A "marked" restriction is measured as being more than moderate but less than extreme. 20 C.F.R. § 404, Subpart P, Appendix 1, 12.00 (C).

[10] To satisfy this condition, a claimant must have either three episodes within a year, or average one episode every four months, each period of decompensation lasting for at least two weeks. 20 C.F.R. § 404, Subpart P, Appendix 1, 12.00 (C)(4).

with symptoms or signs currently attenuated by medication or psychosocial support," and either repeated, extended episodes of decompensation, a residual disease, or a history of one or more years' inability to function outside a highly supportive living arrangement under 12.04. 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ first reviewed Manning's impairments including his substance abuse and found Manning met the paragraph B criteria. (R. 16). When he was still using alcohol, the ALJ found Manning had marked difficulties in social functioning as well as concentration, persistence and pace. (R. 16). The opinion notes that before he stopped drinking, Manning acknowledged consuming up to a liter of vodka each day to self-medicate. He described uncontrollable behavior, his wife was fearful of him. Immediately after his return from deployment he had problems with short-term memory, poor impulse control, and no motivation. (R. 16, citing R. 564-65). In addition, the ALJ found that while abusing alcohol, Manning experienced one to two episodes of decompensation.

Because Manning's substance use contributed to his impairments, the ALJ next considered Manning's impairments after he stopped substance use. The parties agree that Manning's mental capabilities in the absence of substance abuse are most important to the ALJ's analysis, since Manning cannot be found disabled if his alcoholism is a contributing material factor to his alleged impairments. 42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535; (ECF No. 13 at 16-17; ECF no. 10 at 20). Thus, in this case, the period from November 2009 to the present is most relevant to the ALJ's analysis because it marks the period when Manning discontinued the use of alcohol. See Finley v. Astrue, No. 5:08-CV-209-D(1), 2009 WL 2489264, *6 (E.D.N.C. Aug. 13, 2009) ("According to SSA policy, the evidence 'most useful' to distinguishing between

the [substance abuse]-imposed limitations and the limitations from other impairments is that relating to a period when the individual is not using drugs or alcohol.") (citations omitted). There is no dispute that, at the time of the hearing on March 29, 2011, Manning had remained free of alcohol use since November 2009, a period of over seventeen months. Examining this period alleviates the difficult task of trying to disentangle Manning's symptoms of PTSD, traumatic brain injury, and alcoholism. Rather, the period from November 2009 to the present provides a clearer picture of Manning's alleged impairments in the absence of substance abuse. During this extended period of successful treatment for his alcohol dependence, the ALJ concluded that Manning was not disabled. He first found Manning's remaining impairments, while not sufficient to meet a listed impairment, were nonetheless severe. He then concluded Manning had the RFC to perform a wide range of light work. In this case, the undersigned finds that there is substantial evidence to support the ALJ's findings.

The ALJ first found that, without substance abuse, Manning's impairments or combination of impairments, while severe, did not meet or medically equal one of the listed impairments in Appendix 1. In support of this finding, the ALJ cited Manning's testimony that he begins his day at 7:30 am, drives to medical appointments at Portsmouth Naval Hospital where he remains for the day until he drives home. (R. 17). He highlighted the fact that in the evenings Manning spends time with his family, performs some household chores, watches television, and helps his children with their homework. Id. The ALJ noted that Manning has mild social difficulties. He and his wife have dinner on Fridays, but otherwise Manning has limited social contact and no hobbies. Id.

With regard to Manning's concentration, persistence and pace, the ALJ found that he has moderate difficulties in the absence of substance abuse. (R. 17). He noted that Manning continues to have difficulty sustaining concentration, sleeps poorly even with medication, and will require continued psychiatric care. Id. The ALJ noted that since stopping his alcohol abuse, Manning had no episodes of decompensation. Id.

Contrary to Manning's assertion that the ALJ did not cite one medical source to support his conclusion that Manning no longer met a listing in the absence of substance abuse, the ALJ identified numerous records to support his findings regarding Manning's capabilities. The ALJ is not required to identify a medical source which alone reaches an identical conclusion to the Commissioner's. See McGill v. Commissioner of Social Security, 2008 WL 2909624, *3 (3rd Cir. 2008). In fact, weighing the medical evidence relative to the listed impairments is the task of the ALJ. 20 C.F.R. §404.1527(e)(2) ("Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law."). The ALJ discussed additional medical evidence throughout his opinion. He highlighted Manning's comprehensive neuropsychiatric testing conducted after he had been sober for six full months. (R. 18, 569-80). The results indicated that Manning read at a 12.9 grade level, had above average concentration, average and sometimes above average memory, and normal bilateral motor skills. Id. Dr. Karen Johnson, who performed the tests, concluded that Manning has no more than a mild loss of cognitive function. Id.

The ALJ noted that Manning's medical examinations consistently show that he was alert and oriented and has not relapsed with respect to his alcohol or opiate dependence. (R. 19, 299, 280, 273, 544, 546, 548, 550, 564-68, 583-871). The ALJ specifically referred to an appointment

with Dr. Ozimek on March 17, 2010 which documented Manning as alert, fully oriented, neatly dressed, with fair eye contact, fluent speech, free of psychomotor agitation and retardation, and with linear, goal directed thoughts. (R. 19; 299). At that same appointment, the ALJ noted that Manning's judgment and insights were assessed as fair. Id. The ALJ discussed other recent examinations, citing Manning's visit on March 10, 2010 which showed Manning's continued participation in AA and regular daily exercise. (R. 20).

The ALJ also considered the opinions of the state agency medical and psychological reviewers who determined that Manning retained the capacity for medium exertion, ruled out social limitation, and found the claimant able to carry out detailed instructions without limitation. (R. 20). Contrary to their opinions, the ALJ determined that "the longitudinal record support the claimant's excellent response to aggressive treatment and sobriety, but the evidence documents that social, concentration, and persistence limitations remain...." Thus the ALJ opined that Manning was more limited than described by the agency consultants, but nonetheless did not meet either the Paragraph B or C criteria in the absence of substance use. Id. This finding is supported by substantial evidence.

Substantial evidence also supports the ALJ's finding that Manning's impairments left him with the RFC to perform a broad range of light work when he discontinued substance use. In fact, Manning has cited no medical source in the record that would suggest he is precluded from all work when he is not abusing alcohol. Without diminishing the seriousness of his PTSD diagnosis, most of Manning's medical records indicate the he was consistently released without limitations. (R. 282-83, 299, 300-01, 305-06, 316-17, 320-21, 331-32, 335-38, 340-41, 345-46, 355-61, 544, 557). Dr. Ozimek's October 28, 2010 report indicates that Manning's degree of

22

civilian performance impairment is only moderate.  (R. 586).  His neuropsych testing established that he retains a high level of cognitive ability.  (R. 569-80).

Manning primarily argues that the ALJ ignored his GAF scores after November 2009, which he believes are medical evidence of a severe impairment.   Though the ALJ omitted specific references to Manning's numerous GAF scores, the ALJ is not required to comment on every piece of evidence in the record.  Newton v. Astrue, 559 F. Supp. 2d 662, 672 (E.D.N.C. 2008) (citing Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir.2005); Anderson v. Bowen, 868 F.2d 921, 924 (7th Cir.1989)).  "Rather, the ALJ must 'provide [this Court] with sufficient reasoning for determining that the proper legal analysis has been conducted.'"  Newton, 559 F.Supp.2d at 673 (quoting Keeton v. Dept. of Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir.1994)).   As described above, the ALJ commented on a significant amount of probative evidence in the record in this case.  These medical records are from some of the same medical sources responsible for the varying GAF scores.

Furthermore, a GAF score does not have significant weight relative to a claimant's overall medical record.  "A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given. Without additional context a GAF score is not meaningful." Love v. Astrue, 3:11CV14-FDW-DSC, 2011 WL 4899989 (W.D.N.C. Sept. 6, 2011) (citing Green v. Astrue, C/A No. 1: 10–1840–SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) (emphasis added)).   While a GAF score provides evidence of an impairment, "it alone is not determinative of social security disability."  Brown v. Astrue, CIV.A. 7:08CV003, 2008 WL 5455719, *5 n.6 (W.D. Va. Dec. 31, 2008) (citations omitted).; see also

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746 (2000).

Finally, as the Commissioner notes, a low GAF score does not necessarily suggest that the claimant is precluded from work. (ECF No. 13 at 20). GAF scores reflect either serious symptoms or impairments in functional abilities. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed., Text Revision 2000). "A GAF score is intended to be used in treatment decisions and may have little to no bearing on a plaintiff's occupational functioning." Love v. Astrue, 2011 WL 4899989 at *4 (citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006)). "A GAF score, standing alone, is not evidence of an impairment that seriously interferes with Plaintiff's ability to work." Love v. Astrue, 2011 WL 4899989 at *4 (citing Lopez v. Barnhart, 78 F. App'x 675, 678, 2003 WL 22351956 (10th Cir.2003)). This guidance appears particularly relevant to Manning's numerous GAF scores which sometimes fluctuate significantly with little corresponding change in the symptoms observed by his clinicians.[11]

To the extent that Manning's occasional low GAF scores conflict with the Commissioners' findings that Manning retains the ability to work, there is other, substantial evidence in the record that supports the Commissioner's conclusion. Specifically, Manning was consistently released from care without work limitations, and reported significant continued improvement to his medical care providers. Manning's comprehensive neuropsychiatric testing, conducted after he had been sober for six full months, indicated that Manning read at a 12.9

---

[11] Compare Dr. Ozimeck's note of July 13, 2010 (R. 550) describing Manning as "alert oriented x4, neatly dressed on time to his appointment. No psychomotor retardation or agitation... . Mood was described as all right. Affect was euthymic. Thought processes were linear and goal directed....Insight and judgment was fair," with Manning's GAF score of 25 on admission to inpatient treatment for PTSD on August 4, 2010. (R. 564).

grade level, had above average concentration, average and sometimes above average memory, normal bilateral motor skills, and no more than a mild loss of cognitive function. (R. 569-80). Other than the GAF scores, Manning has not proffered what evidence he believes the ALJ overlooked or rejected. He has not identified any report of Manning's cognitive abilities or social functioning after Manning discontinued abusing alcohol which differs materially from the ALJ's findings. Because the ALJ considered all of the relevant records, and the records are consistent with his assessment of Manning's RFC in the absence of substance use, the undersigned finds that the ALJ's opinion is supported by substantial evidence.

C.     **The ALJ appropriately elicited testimony from the Vocational Expert.**

Manning also argues that the ALJ's hypothetical question to the VE was improper because it allegedly failed to include Manning's mental limitations such as concentration, persistence or pace.

At the fifth step in the sequential analysis, the ALJ must determine whether a claimant can perform any other work available in significant numbers in the national economy, considering the claimant's age, education, and past work experience. 20 C.F.R. § 404.1566 and 416.966. Step five is reached when the claimant is not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings, but nevertheless prevents a claimant from performing past relevant work. In assessing a claimant's ability to perform other work within the economy, the ALJ will look at exertional limitations--those limitations or restrictions which impact only strength activities; as well as non-exertional limitations--those limitations and restrictions which impact non-strength activities such as concentration and ability to follow instructions. 20 C.F.R. " 404.1569 and 416.969. At step five, the burden of proof

25

shifts to the Commissioner to establish that claimant has the ability to perform other work. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

If the claimant cannot perform his past relevant work, the ALJ may rely on the testimony of a VE determine whether jobs exist in significant number that the claimant could perform, usually by posing a hypothetical question. When relying on VE testimony based on hypothetical questions, the hypotheticals posed must account for all of the claimant's limitations as shown by the record. Walker v. Bowen, 889 F. 2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. Johnson v. Barnhart, 434 F. 3d 650, 659 (4th Cir. 2006) (citing Walker, 889 F. 2d at 50). Failing to consider limitations shown by the evidence, and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. Hancock v. Barnhart, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002). "However, the ALJ need only include in his questioning those impairments which he has found to be credible. If an ALJ does not believe that the claimant suffers from a[n] alleged impairment—and if substantial evidence supports such a conclusion—then the ALJ is not required to include that impairment in questioning the VE." Wilkerson v. Astrue, 7:10-CV-00077-D, 2011 WL 3951165 (E.D.N.C. Aug. 19, 2011) (citing Johnson v. Astrue, No. 5:08–CV–00515–FL, 2009 WL 3648551, at *12 (E.D.N.C. Nov. 3, 2009).

In this case, the ALJ determined that after he discontinued alcohol use, Manning was still unable to perform past relevant work, but had the RFC to perform a nearly a full range of light work that requires the capacity to lift and carry no more than 20 pounds occasionally, stand, sit, and walk six hours in an eight-hour day, and push/pull at weights no greater than lifting, with the

limitation that he avoid close interaction with the public.   (R. 18).   Based on this RFC

determination, the ALJ asked the VE the following hypothetical:

> ...[A]ssume you're dealing with an individual who is 30 years of age, has a high
> school education, and past work experience as described here today..... [A]ssume
> that this individual is capable of light exertion as it's defined by Social Security
> regulations with additional limitations in that the individual would be limited to
> simple repetitive tasks, would need work in an environment that would not
> involve close interaction with the general public,...and would need to avoid
> overhead reaching and should only occasionally lift or carry.  Would there be any
> jobs such an individual could perform?

(R. 46-47).  The VE described several such jobs including assembler, folding machine

operator, and marketing clerk.  (R. 47).

Manning argues, however, that his mental limitations cannot be translated into words

such as "unskilled," "simple," "repetitive," or "routine."  He cites Edwards v. Barnhart, which

held that the ALJ's limitation confining the claimant's jobs to no more than simple, routine,

unskilled work, did not sufficiently account for the claimant's moderate limitation in her ability

to concentrate, persist and keep pace.  383 F. Supp.2d 920, 930-31 (E.D. Mich. 2005).  Manning

also cites Whack v. Astrue, for the proposition that restrictions such as "simple" or "low-stress"

are similarly insufficient to define mental limitations caused by his PTSD.  2008 WL 509210, *7-

8 (E.D. Pa 2008).  Edwards, however, has been criticized by other courts, including Michigan

District Courts.  See e.g. McNamara v. Commissioner of Social Sec., Civil Action No. 11-10331,

2011 WL 7025855, *12 (E.D. Mich. Dec. 1, 2011) Infantado v. Astrue, 263 F. App'x 469, 476

(6th Cir.2008).

More importantly, subsequent case-law, including district court decisions within the

Fourth Circuit, reach the opposite result.  See Brachtel v. Apfel, 132 F.3d 417, 421 (8th

27

Cir.1997)); Parker v. Astrue, 792 F.Supp.2d 886, 896-97 (E.D.N.C. 2011) (finding that a hypothetical which includes limits to simple, routine, repetitive tasks adequately accounts for claimant's deficiencies in concentration, persistence, or pace)(citing Howard v. Massanari, 255 F.3d 577, 582 (8th Cir.2001); West v. Astrue, Civil Action No. 4:10—CV—2712—MBS, 2012 WL 988113, *9-10 (D.S.C. March 21, 2012); Smith v. Astrue, Civil Action No. 8:10—cv –2624, 2012 WL 786944, *19-20 (D.S.C. Jan. 18, 2012). In Manning's case the ALJ crafted a hypothetical which accounted for the limitations imposed by both his mental and physical limitations. The lifting and overhead reaching restrictions accounted for Manning's physical limitations resulting from his shoulder injury. The ALJ also found mental limitations including moderate deficiencies in concentration which he accommodated by limiting the VE to jobs involving simple repetitive tasks. See Parker v. Astrue, 792 F.Supp.2d at 896-97. The ALJ also addressed Manning's tendency towards isolating behavior and irritability by limiting close interaction with the public. These limits accurately conveyed his RFC to the VE. Finally, Manning fails to identify specific limitations which he believes should have been included in the hypothetical, but were omitted.

In light of the relevant case-law, and particularly given Manning's high performance scores on his cognitive abilities, and the limited residual symptoms following his extensive treatment for PTSD, the undersigned finds no error in the ALJ's hypothetical posed to the VE.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's Motion for Summary Judgment, DENY Manning's Motion for Summary Judgment, and AFFIRM the final decision of the Commissioner.

28

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

May 11, 2012

**<u>Clerk's Mailing Certificate</u>**

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John Osborne Goss
Goss, Meier & Fentress
735 N Newtown Rd
Suite 100
Norfolk, VA 23502

Lawrence Richard Leonard
United States Attorney Office
101 W Main St
Suite 8000
Norfolk, VA 23510


Fernando Galindo, Clerk


By _____
    Deputy Clerk


_____, 2012